IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RHONDA D. NAUGLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CV-492-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Rhonda D. Naugle ("Naugle"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Naugle appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Naugle was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on July 29, 2008, Naugle was 46 years old. (R. 25-26). Naugle had a sixth grade education. (R. 26).

One of the problems that kept Naugle from working was her right wrist. (R. 28-29). Naugle testified that the problem stemmed from an incorrect setting after she broke her wrist in

the early 1990s. *Id.* She had experienced continuing pain from it, and, at her physician's recommendation, she had fusion surgery three or four months prior to the hearing. (R. 29). Because of the surgical fusion, she could not bend her wrist at all. (R. 30). Naugle testified that the doctors had told her not to lift anything over 8 or 9 pounds, and to wear her brace at all times. (R. 30-31). At the time of the hearing, she did not have full use of the fingers on her right hand. (R. 31). Since the surgery, Naugle had found that she could not lift a gallon of milk, because the attempt caused pain. *Id.*

Naugle had experienced a brain aneurysm in 1988 and had been on disability for some time before returning to work. (R. 32). She had a second brain aneurysm in May of 2007, which turned out to be in the same place as the first aneurysm, and she had surgery through the artery to repair the second aneurysm. (R. 32-33). Since that surgery, she had experienced problems with her memory. (R. 33). She had difficulty with focus and concentration, and she experienced severe anxiety and depression. *Id.* She took medication for the anxiety and depression, and she attended counseling, but she did not think those efforts controlled her condition. (R. 34). Her primary care physician had referred her to a psychiatrist, but she had not yet seen the psychiatrist. *Id.*

Naugle testified that she had anxiety and felt short of breath. *Id.* She felt as though her heart were "going to jump out," and she saw dots in her vision. *Id.* She experienced this every day, but some days were worse than others. *Id.*

She testified that she was able to take care of the household chores, but they were harder than before. (R. 35). She was learning to use her left hand for tasks such as vacuuming. *Id.* She had no trouble going to sleep, but she would wake five or six times during the night. *Id.* She testified that she was sensitive to noises since the surgery for the second aneurysm. (R. 36).

Naugle was seen at the emergency room at SouthCrest Hospital on June 23, 2004 for trauma to her right wrist. (R. 153-59). X-rays taken at that time showed several issues, but the impression of the reviewing physician was severe degenerative arthrosis throughout the wrist. (R. 157). Naugle was seen at the OSU Physicians Clinic for follow up on July 8, 2004. (R. 195). Her wrist was swollen and painful, it had limited movement, and there was a visible bruise. *Id.* The assessments were degenerative joint disease of the right wrist, an old navicular fracture, and unstable right wrist. *Id.* She was given prescriptions for pain medications, she was told to wear a wrist splint, and she was referred for an orthopedic consultation. *Id.*

Naugle was seen by Lamont Cavanagh, M.D. at the OU Physicians Clinic on July 22, 2004 for an orthopedic consultation regarding her right wrist. (R. 176-78). The diagnoses were osteoarthritis and "dislocation closed wrist" not otherwise specified. (R. 178). On August 4, 2004, James F. Bischoff, M.D., with Eastern Oklahoma Orthopedic Center performed an injection of the joint with anti-inflammatory medications. (R. 293-94). He stated that he recommended avoiding surgery due to the moderate amount of wrist arthrosis. (R. 294).

On September 21, 2004, Naugle was seen at the OSU Physicians Clinic for complaints of depression and of seizures. (R. 193). She was assessed with seizure disorder and dysthymia, and she was prescribed dilantin and Prozac. *Id.* At a follow up appointment on October 5, 2004, Naugle reported that she had not experienced any seizures, but she still felt depressed and she couldn't sleep. (R. 192). Her medications were adjusted. *Id.* She was seen again for the same complaints on October 19, 2004. (R. 190-91).

On January 3, 2006, Naugle was seen at the emergency room of SouthCrest Hospital for right wrist pain. (R. 306-16). X-rays taken at that time again appeared to show multiple issues, and the impression was "old scaphoid fracture with secondary accelerated degenerative disease

3

of the wrist." (R. 312).

Naugle was seen at the OSU College of Osteopathic Medicine on January 11, 2006. (R. 179-81). She requested changes to her medications and a referral to Dr. Cavanagh for repeat cortisone injection of her right wrist. (R. 179). Impressions were depression, wrist pain from osteoarthritis, formication,[1] and tardive dyskinesia.[2]

Naugle was seen at the emergency room of SouthCrest Hospital on December 1, 2006 for a chief complaint of her right wrist and right fingers being numb and painful. (R. 295-305). The clinical impression appears to have been carpal tunnel syndrome and chronic right wrist pain. (R. 299). On December 12, 2006, Naugle saw Brian Rich, M.D. at the OU Physicians Clinic, who apparently practiced with Dr. Cavanagh. (R. 367-68). His impression was osteoarthritis of her right wrist, and he prescribed Neurontin and Celebrex. (R. 368). At a follow up appointment on January 9, 2007, Naugle's medications to address the right wrist pain were adjusted. (R. 364-66).

Naugle was hospitalized at Saint Francis Hospital from May 28, 2007 through June 14, 2007 due to brain hemorrhage. (R. 269-92). On June 14, 2007, Saint Francis transferred Naugle to Mercy Health Center in Oklahoma City for further care. (R. 269). On June 20, 2007, Naugle had a cerebral arteriogram with coil and endovascular repair. (R. 334). After the procedure, she was neurologically intact. *Id.* She was discharged from Mercy on June 21, 2007, in good condition. (R. 333-34).

---

[1] Formication is "[a] sensation as of insects creeping upon the body." Taber's Cyclopedic Medical Dictionary 755 (17th ed. 1993).

[2] Tardive Dyskinesia is a "[c]ondition of slow, rhythmical, automatic stereotyped movements" that is an undesired effect of therapy with certain medications. Taber's Cyclopedic Medical Dictionary 590-91 (17th ed. 1993).

4

On discharge from Mercy, Naugle went to the OU Physicians Clinic for follow up on July 11, 2007. (R. 361-63). The physician noted Naugle's complaints of "nerves" and anxiety attacks, and she was noted to be anxious and agitated at the time of the examination. (R. 362). She was prescribed Xanax. (R. 363). Her blood pressure had been elevated when it was first taken, and she was instructed to monitor her blood pressure until a follow up appointment. *Id.* At the follow up appointment on July 25, 2007, Naugle's blood pressure was described as well controlled, and her anxiety was described as well controlled on Xanax. (R. 358-59). At a well woman check up on August 27, 2007, Naugle reported that Xanax was "working well for controlling her anxiety." (R. 349).

Naugle was seen at the OU Physicians Clinic in September and October 2007 for problems unrelated to her disability claim. (R. 419-29). At an October 22, 2007 appointment, several medical issues were addressed, and x-rays of Naugle's right wrist were ordered. (R. 416-18).

Naugle was seen at The Orthopaedic Center on December 4, 2007 regarding her right wrist. (R. 371-72). X-rays taken at that time showed severe osteoarthritis, ulnar deviation, and "a slack wrist." (R. 372). On examination, Naugle's right wrist had swelling and limited range of movement. *Id.* All of her digits had normal range of motion, and opposition of the thumb was intact. *Id.* She was advised that her wrist condition would not improve and would possibly worsen, and surgical options were discussed, including wrist fusion. *Id.* Naugle was seen again on December 17, 2007 for right wrist pain she described as 8 out of 10, and she was given a steroid injection. (R. 369-70).

At a January 8, 2008 appointment at the OU Physicians Clinic, Naugle complained of severe anxiety related to her aneurysm, including a fear that she still had an aneurysm. (R. 402-

05). On January 17, 2008, Naugle came to the OU Physicians Clinic with a severe headache that she had experienced for four days, and she was sent to the emergency room for evaluation, due to her history of cerebral aneurysm. (R. 399-401). At the Hillcrest emergency room, she was diagnosed with a tension headache after a CT scan of her brain was negative. (R. 452-62).

Naugle was seen at The Orthopaedic Center on March 10, 2008 for wrist pain, and she was told to continue splinting it to reduce her pain. (R. 500). On March 12, 2008, Naugle was evaluated by Brian Chalkin, D.O. for surgical intervention. (R. 497-98). His impression was "[r]ight wrist stage IV SLAC wrist with pancarpal arthritis." (R. 497). He informed Naugle that total wrist fusion was her only surgical option. *Id.*

On March 27, 2008, Naugle was seen at the OU Physicians Clinic for clearance for wrist surgery, and she was given clearance. (R. 390-92).

The right wrist fusion surgery was done at Hillcrest Medical Center by Dr. Chalkin on April 8, 2008. (R. 495-96). She was seen at The Orthopaedic Center for follow up on several occasions following the surgery, and her care included splints and a cast during her recovery from the surgery. (R. 491-94).

Naugle was seen for a new patient psychiatric evaluation by Mark A. Kelley, M.D. on May 24, 2007. (R. 343-45). On Axis I[3] diagnoses were major depressive disorder, severe, psychotic; polysubstance abuse in remission; possible personality and mental changes related to aneurysm and surgery; possible bipolar disorder. (R. 345). Dr. Kelley assessed Naugle's global

---

[3]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

assessment of functioning ("GAF")[4] as 60 current and 60 highest in the previous year. *Id.*
Naugle saw Dr. Kelley again on June 29, 2007 after the surgery for the recurring aneurysm. (R. 385). Dr. Kelley noted that Naugle described possible panic attacks that occurred while she was in the hospital and that she had been started on Xanax and Lexapro. *Id.* He recommended consideration of a mood stabilizer such as Abilify, and he wondered if some of her behavior was evidence of a manic episode. *Id.*

Agency nonexamining consultant Karen Kendall completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on March 31, 2006. (R. 205-22). For Listing 12.04, Dr. Kendall noted Naugle's depressive syndrome. (R. 208). For the "Paragraph B Criteria,"[5] Dr. Kendall found that Naugle had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 215). She found insufficient evidence of episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Kendall

---

[4]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

[5]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

noted that the medical evidence of record showed that Naugle had suffered dysthymia since 2004. (R. 217). She noted that Naugle continued medication from her treating physician for her dysthymia and her difficulty sleeping, but had no referrals for mental health care. *Id.* She also noted Naugle's history of methamphetamine abuse and her activities of daily living, including some difficulty with concentration. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Kendall found that Naugle was moderately limited in her ability to understand, to remember, and to carry out detailed instructions. (R. 219). Dr. Kendall also found Naugle to be moderately limited in her ability to maintain attention and concentration for extended periods, and in her ability to interact appropriate with the general public. (R. 219-20). She found no other significant limitations. *Id.* Dr. Kendall stated that Naugle could perform simple and some complex work, and might have some concentration difficulties. (R. 221). She could relate appropriate with coworkers and supervisors and could have incidental contact with the public. *Id.* She was able to adapt to some work change. *Id.*

A Physical Residual Functional Capacity Assessment dated April 20, 2006 by agency nonexamining consultant K. Rowlands, M.D. concluded that Naugle could perform medium work with no other limitations. (R. 223-30).

Naugle was evaluated by agency consultant Seth Nodine M.D. who performed a physical examination on February 24, 2007. (R. 231-37). Naugle's chief complaint was her right wrist, and on examination Dr. Nodine noted slight swelling. (R. 232-33). There was a positive Tinel's sign on the right. (R. 232). Her fifth fingers of both hands were deformed, with the right being worse than the left, but she could still make a fist and her strength was equal. (R. 233). Dr. Nodine's assessments were major depressive disorder, seizure disorder secondary to her 1998

8

brain aneurysm with surgical repair, and chronic right wrist pain with swelling and decreased range of motion. *Id.* The hand/wrist sheet was attached showing decreases in the range of motion of Naugle's right wrist and fingers. (R. 237). Dr. Nodine stated that Naugle could effectively oppose the thumb to the fingertips, could manipulate small objects, and could effectively grasp tools. *Id.*

Naugle was evaluated by agency consultant Linda R. Craig, Psy. D. on February 20, 2007. (R. 238-41). Dr. Craig evaluated Naugle's concentration as normal, her insight and judgment as fair, and her intelligence as average. (R. 238). Dr. Craig's impression on Axis I was dysthymic disorder, and on Axis II was personality disorder not otherwise specified with borderline traits. (R. 240). She assessed Naugle's GAF as 55. *Id.* Dr. Craig stated that Naugle's ability to work was "mildly impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, and socially interacting with coworkers." *Id.*

A second set of the Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form was completed after Dr. Craig's report by agency nonexamining consultant Cynthia Kampschaefer, Psy. D. on March 21, 2007. (R. 242-55). For Listing 12.04, Dr. Kampschaefer noted Naugle's dysthymia. (R. 245). For Listing 12.08, Dr. Kampschaefer noted a personality disorder evidenced by intense and unstable interpersonal relationships and impulsive and damaging behavior. (R. 249). For Listing 12.09, Dr. Kampschaefer noted Naugle's history of substance abuse that was in sustained remission. (R. 250). For the Paragraph B Criteria, Dr. Kampschaefer found that Naugle had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 252). She found insufficient evidence of episodes of decompensation. *Id.* In the Consultant's Notes portion of the form, Dr. Kampschaefer noted that

9

Naugle took prescription medications and saw a psychiatrist, but the last record was in January 2006. (R. 254). She quoted Dr. Craig's diagnoses and her language regarding Naugle's work-related impairments. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that Naugle was moderately limited in her ability to understand, to remember, and to carry out detailed instructions. (R. 256). Dr. Kampschaefer also found Naugle to be moderately limited in her ability to interact appropriate with the general public. (R. 257). She found no other significant limitations. (R. 256-57). Dr. Kampschaefer stated that Naugle could perform simple and some complex tasks, she could relate to others on a superficial work basis, and she could adapt to a work situation. (R. 258).

Agency nonexamining consultant Carmen Bird, M.D. completed a second Physical Residual Functional Capacity Assessment on March 21, 2007, following Dr. Nodine's report. (R. 260-67). She again found that Naugle had the capacity to perform medium work with no other limitations, citing to Dr. Nodine's report. (R. 261).

## Procedural History

Naugle filed an application seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. with a protected filing date of October 26, 2005. (R. 12, 88-90). The application was denied initially and upon reconsideration. (R. 45-48, 54-56). A hearing before ALJ Richard J. Kallsnick was held July 29, 2008 in Tulsa, Oklahoma. (R. 21-42). By decision dated August 18, 2008, the ALJ found that Naugle was not disabled. (R. 12-20). On June 2, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[6]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Naugle had not engaged in any substantial gainful activity since the application date of October 26, 2005. (R. 14). At Step Two, the ALJ found that Naugle had severe impairments of degenerative arthrosis of the right wrist, aneurysm clip in the anterior cerebral arteries, major depressive disorder, personality disorder, and substance abuse addiction in remission. *Id.* At Step Three, the ALJ found that Naugle's impairments did not meet a Listing. *Id.*

The ALJ determined that Naugle had the RFC to do light work with several additional limitations. (R. 15). Naugle was limited to simple tasks and some complex tasks under ordinary supervision, she could relate to others on a superficial basis, and she was limited to minimal contact with the public. *Id.* The ALJ expressly found no postural, manipulative, or visual limitations. *Id.* He found an environmental limitation in that Naugle would be required to use seizure precautions, although he found that her seizure disorder was controlled with medication. *Id.* At Step Four, the ALJ found that Naugle could not perform her past relevant work. (R. 18). At Step Five, the ALJ found that there were a significant number of jobs in the national economy

that a person with Naugle's age, education, work experience, and RFC could perform. (R. 19). Therefore, the ALJ determined that Naugle was not disabled at any time from her application date of October 26, 2005 through the date of his decision. *Id.*

### Review

Naugle[7] raises issues regarding the ALJ's RFC determination, the ALJ's credibility assessment, including his assessment of Naugle's allegation of disabling pain, and the testimony of the vocational expert. Because the undersigned finds that the ALJ's RFC determination is not supported by substantial evidence, the other allegations of error raised by Naugle are not addressed.

A brief review of the timeline of Naugle's case will help illustrate the concern the undersigned has with the ALJ's RFC determination. Naugle's protective filing date was October 26, 2005, and it seems clear that her claims of disability arose primarily from her alleged mental impairment of depression and her alleged physical impairment of reduced use of her right wrist and the pain associated with her wrist condition. There is no treating physician opinion evidence, and therefore the only opinion evidence is that which comes from the various examining and nonexamining consultant opinions. These reports are dated from March 2006 through March 2007. (R. 205-67).

After the last of these opinions, Naugle's medical condition changed dramatically in two

---

[7]This is apparently the first case counsel for Naugle has had with the undersigned. The undersigned advises counsel that endnotes are not considered helpful. Instead, case citations should be in the text of the brief itself, and other matters should be included in footnotes rather than in endnotes for ease of reference. Finally, the Scheduling Order included a page limitation of ten pages for Naugle's opening brief. Dkt. #9. The endnotes, in a smaller font, made Naugle's opening brief 14 pages long. If counsel needs more than 10 pages in the future, counsel should make an application for additional pages rather than adding extensive endnotes. The undersigned expects counsel to correct all of these aspects of formatting in future filings.

ways. The first change in Naugle's health history was her hospitalization from May 28, 2007 through June 21, 2007 due to a cerebral aneurysm and resulting coiling procedure. (R. 269-92, 317-40). At the hearing, Naugle testified that her mental condition had worsened since the aneurysm and procedure. (R. 33-34). This testimony was buttressed by notes of her treating physician that she appeared anxious and agitated directly after the procedure and needed Xanax to control anxiety and panic attacks. (R. 358-59, 363). Dr. Kelley, a treating psychiatrist, noted that Naugle's description of symptoms in the hospital appeared to be panic attacks. (R. 385).

The second change in Naugle's health after the last of the consulting reports in March 2007 was her wrist fusion surgery. All of Naugle's appointments with the specialists at The Orthopaedic Center regarding her right wrist were in December 2007 or in 2008, after the agency consultants had completed their reports. (R. 369-72, 491-500). Naugle had wrist fusion surgery, which Dr. Chalkin had described as the only surgical option, in April 2008. (R. 495-98). Dr. Chalkin stated that Naugle understood that after the fusion surgery "that she will never move the wrist, that the goal is to stop the pain. She can use her fingers, she can use her thumb, but she cannot move her wrist." (R. 497).

Under ordinary circumstances, the reports of examining and nonexamining consultants can be substantial evidence upon which the ALJ can rely in formulating his RFC determination. *Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination). Here, however, the reports of the various consultants can not constitute substantial evidence because they were all completed before the two major

changes to Naugle's health described above. In *Stephens v. Apfel*, 134 F.3d 383, 1998 WL 42524 at *2 (10th Cir.) (unpublished), the court had multiple problems with the ALJ's decision, but one was the "obvious" problem of using a "stale" 1989 consulting report instead of a current 1993 treating assessment. The Third Circuit addressed the problem of stale evidence in Social Security cases in more detail in *Wier ex rel. Wier v. Heckler*, 734 F.2d 955, 963-64 (3d Cir. 1984). In *Wier*, the claimant was 17, but the ALJ relied on reports that had been completed when he was 11 and 13. *Id.* The court found the reliance on the reports "particularly troubling" because they were "extraordinarily stale." *Id.*

Here, the consultant reports could not constitute substantial evidence under the particular circumstances of Naugle's situation. The two conditions that she alleged caused her problems, mental issues and wrist issues, changed substantially after the consulting reports but before the hearing with the ALJ. Under these circumstances, the undersigned finds that the consulting reports were stale and could not constitute substantial evidence on which the ALJ could rely in formulating his RFC. Without the use of those reports, there was not substantial evidence supporting the ALJ's RFC determination.

Because the lack of substantial evidence supporting the ALJ's RFC determination requires reversal, the undersigned does not address the remaining contentions of Naugle. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Naugle.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838

F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 2nd day of September, 2011.

_____
Paul J. Cleary
United States Magistrate Judge